No. 7717.

HERNSHEIM & BROTHER vs. L. A. LEVY.

Where defendant in attachment reconvenes, the allegation in his plea in reconvention that "plaintiffs by their unlawful attachment of his goods have damaged him in his business to the amount of ten thousand dollars," is sufficiently clear and certain to admit of any evidence tending to show the amount of the pecuniary loss suffered by him in his business by reason of the attachment.

An attachment based upon Nos. 4 and 5, art. 240, R. C. P. cannot be maintained without satisfactory proof of some act indicating the fraudulent intent of defendant to place his property beyond the reach of his creditors, or to give an unfair preference to some of them. The daily selling of his goods, in the regular course of his business, by a permanent dealer, is not such an act, although he be financially embarrassed.

APPEAL from the Tenth Judicial District Court, parish of Caddo. Boarman, J.

Alexander & Blanchard and Looney & Elstner for plaintiffs and appellants:

First—That misrepresentations as to the ownership of goods by the defendant after the ownership had ceased, supplemented by other suspicious circumstances, will justify the plaintiff in attaching. 29 An. 635.

Second—The plea in reconvention is not sufficiently explicit of the cause of action, in stating the manner in which defendant was damaged— how damaged—the items going to make up this aggregate of damage, etc. 6 M. 510.

"Every circumstance which may be considered proper to be known, in order to put plaintiffs on a just defense of the reconvention, ought to have been stated."—Id.

The plea is too vague and indistinct; general allegations will not suffice; plaintiffs ought to have been informed of the nature of the damages intended to be proven in order to prepare themselves to disprove it. 17 L. 371; 2 R. 216; 2 N. S. 85; 5 N. S. 18; 3 R. 258, 364; 2 An. 932; 7 An. 635; 9 An. 6; 4 An. 381; 11 R. 347.

"A general allegation of indebtedness in a gross sum, without specification of the time, place, or manner in which the debt accrued, is too vague to authorize proof of it." H. D. p. 1155, No. 5; 6 L. 77.

" Pleas in reconvention must be set forth with the same certainty as to amounts, dates, etc., as if advanced in a direct action." H. D. page 1173, No. 1.

T. F. Bell and J. C. Moncure for defendant and appellee :

First—That a resident debtor is not amenable to the writ of attachment for selling goods in the usual course of trade.

Second—That one who has been illegally attached has a right to recover all damages caused by such attachment.

———

The opinion of the court was delivered by

MARR, J. Plaintiffs, merchants of New Orleans, brought this suit against defendant, a merchant of Shreveport, for the balance due on account, some $2000. The petition charges that plaintiffs " verily believe that defendant has assigned or disposed of, or is about to assign and dispose of his property, rights, or credits, or some part thereof, with intent to defraud his creditors, or give an unfair preference to some of them ; or that he has converted, or is about to convert his property into money or evidences of debt, with intent to place it beyond the reach of his creditors ;" and they prayed for an attachment. An agent of plaintiffs made affidavit that the allegations of the petition were true, " to the best of his knowledge and belief ;" and the attachment was ordered. Writs were issued to the sheriff of Caddo, and to the sheriff of Webster parish, under which the sheriff of Caddo seized the lease for three years of defendant's store at Shreveport, appraised at $500 ; the stock of goods appraised at $5607 32 ; and other effects, appraised at $335 ; and the sheriff of Webster seized, in the store of A. Levy, at Minden, the stock of goods, appraised at $2381 25.

Defendant moved to dissolve the attachment on the ground that the allegations of the petition and affidavit were not true, and did not warrant the attachment. This motion was referred to and tried with the merits. In his answer defendant adopted the allegations of his motion to dissolve ; and he plead the general denial. He alleged that plaintiffs were non-residents of Caddo parish, and that " by their unlawful attachment of *his* goods, they have damaged *him* in his business to

the amount of ten thousand dollars," for which he prayed for judgment in reconvention.

There was no dispute as to the account of plaintiffs ; and there was judgment in their favor for the balance due. The attachment was dissolved ; and there was judgment in favor of defendant, on his reconventional demand, for $1425, general damages, and $250, special damages for attorney's fees, aggregating $1675. Plaintiffs appealed suspensively ; and defendant, in answer to the appeal, prays that the damages be increased.

On the trial plaintiffs objected to all the evidence offered by defendant to prove damages caused by the attachment, on the ground that the demand in reconvention was too vague and uncertain to authorize proof. The district judge overruled this objection. Defendant's only cause of complaint was the unlawful attachment of his goods. The allegations on which the attachment was granted were traversed ; and the facts, which it would have been necessary to recite, in an independent suit for damages, already appeared of record in the cause. On the dissolution of the attachment the plaintiffs would be liable in damages ; and the most direct and obvious damage would be that which defendant would suffer in his business by the seizure of his goods, and the closing of his store. Plaintiffs have no cause to complain that defendant chose, by his pleading, to limit his demand in reconvention to the actual pecuniary loss suffered by him in his business ; and the allegations of the answer are sufficiently clear and certain to admit of any evidence tending to show the amount of the pecuniary loss suffered by defendant in his business, by reason of the attachment.

The questions to be determined are :

1. Was the attachment wrongfully obtained ?

2. If it was, what pecuniary loss and damage resulted to defendant?

We shall endeavor to give a condensed statement of the facts upon which the solution of these questions depends, without attempting to analyze the entire mass of testimony in this voluminous record, much of which we consider irrelevant.

Defendant commenced business at Shreveport in 1872. He was young, energetic, and industrious ; and he acquired a good reputation as a business man, and built up a profitable business. Notaries and bank officers testified that he met his pecuniary engagements promptly ; and that his name had never been dishonored by protest.

In December, 1877, Tomkies' Bank, in which he kept his account, failed, with a balance to his credit of $1300, about half of which was lost. In February, 1878, his store, the upper part of which he occupied as a dwelling, was destroyed by fire. He was covered by insurance to the extent of $11,000 ; but his books and papers were burned ; and he

had some difficulty in making a satisfactory statement of his loss, which he estimated at $22,000, in goods, furniture, and apparel. The insurers sent agents and adjusters to make a settlement with him ; and they finally offered to pay him something over $8000, with the alternative of immediate acceptance, or a lawsuit. He accepted the amount offered, as a compromise, and to avoid the ruinous delays of a litigation with the underwriters. He says, and there is no proof to the contrary, that the used this money in paying his debts, dollar for dollar. On the third day after the fire he wrote to plaintiffs that his insurance would pay his debts, and for the furniture which he needed ; that he believed his credit was good every where ; and that the bank would indorse for him for all the wanted. The object of this letter was, through the influence of plaintiffs, to procure furniture on credit, for immediate use.

On the failure of Tomkies' Bank, Johnson, a banker at Shreveport, without solicitation or request on the part of defendant, offered to assist him pecuniarily ; and on the 28th December, 1877, Johnson's Bank opened an account with him, beginning with a deposit of $50, and a check of same date for $321 ; and he was allowed to overdraw as convenience required. In April he took a lease, for three years, of a new store, at the annual rent of $1000, payable monthly ; and, with the assistance afforded by the bank, he fitted up the store and commenced business again, carrying but a small stock during the summer.

In September defendant went to New York, and purchased goods on time ; and he made arrangements there, and at St. Louis, to have his orders filled as his business might justify and require. Shortly after his return from New York one Focke, traveling agent for plaintiffs, arrived at Shreveport ; and while he was there he received instructions from plaintiffs to press the settlement of the account due by defendant. The immediate cause of this seems to have been that when defendant was in New York he did not call at plaintiffs' establishment in that city, which was a branch of their New-Orleans house. When Focke mentioned this to defendant, defendant told him he had not called on plaintiffs in New York for want of time ; that he did not intend to increase his indebtedness to plaintiffs until he had made some payments ; that he had on his shelves but few goods in plaintiffs' line ; that he would pay Focke something on account ; and would give his notes for $100, payable weekly, or for $200, payable every fifteen days, until January, when he would be able to pay the whole. He attributed his present inability to pay to the loss by fire, and the rigid quarantine, caused by the epidemic of 1878, which had seriously interfered with business. Nevertheless, he paid Focke $100, on account on the 16th October.

There was much correspondence between Focke and plaintiffs, by telegraph, the result of which was that Focke was authorized to take

defendant's notes, at short dates, to be secured by indorsement. Defendant said he had never indorsed for any one; that it was a delicate matter to ask any one to indorse for him; that his name was good enough; and that he had never been protested. Finally, he said his brother at Minden, whose indorsement Focke was authorized to accept, would be at Shreveport on Sunday; and that he would indorse the notes.

For some reason the brother did not come, but his brother-in-law Peiser, the managing partner of the Minden house, came. He refused to indorse, and said the Minden brother would not indorse the notes; and, after some discussion, in which defendant told Focke he could not compel any one to indorse for him who was not willing, Focke left, telling defendant he must take the consequences. On the next day, Monday, 21st October, by authority of a telegram from plaintiffs of same date, this suit was brought and the goods were attached.

Focke arrived at Shreveport on the 12th October. He had no personal knowledge as to the allegations of fact on which the attachment was issued; and he made the affidavit, as agent, " to the best of his knowledge and belief." There is nothing positive in these allegations. The plaintiffs *verily believe* " to the best of the knowledge and belief " of their agent, that defendant *has* assigned or disposed of, or *is about to* assign and dispose of his property, rights, or credits, or some part thereof, with intent to defraud his creditors, or give an unfair preference to some of them; or that he *has* converted, or *is about* to convert his property into money or evidences of debt, with intent to place it beyond the reach of his creditors. It is not possible to say what plaintiffs verily believed defendant had done, or what he was about to do. If an attachment can be validly issued on such an affidavit, a point which we shall not now decide, it cannot be maintained without satisfactory proof of some act on the part of defendant, plainly indicating the fraudulent intent to place his property beyond the reach of his creditors, or to give an unfair preference to some of them.

In October, 1877, when defendant was doing a large business at Shreveport, he established a store at Minden, under an agreement with his brother, A. Levy, and his brother-in-law, H. Peiser, that, when they returned to him the $900, advanced by him in starting the business, they should be the sole proprietors. The proof is that this amount was returned early in January, 1878. The business which had been conducted in the name of defendant alone, was thenceforth conducted in the name of A. Levy; the license and lease were taken in the name of A. Levy; and the sign, and the advertisement in the local paper were changed by substituting the name of A. Levy for that of defendant. A. Levy really meant the partnership composed of A. Levy and H. Peiser; and Peiser, from the beginning, was the business manager of the concern.

The first purchases for the Minden store were made by defendant. After his interest ceased all the purchases were made in the name of A. Levy, by Peiser in person, or in orders. In February, 1878, Peiser purchased goods of plaintiffs, in person, in the name of A. Levy; and they were marked A. Levy, and shipped to A. Levy at Minden. Peiser told plaintiffs that he was a partner in the firm of A. Levy, and from that time A. Levy was a regular customer of plaintiffs. Goods were purchased, for the Minden store, of Gregg & Ford, of Shreveport. At first defendant told Gregg & Ford that he was interested in the Minden store. Afterward, he told them he was no longer interested; and goods were thenceforth purchased of Gregg & Ford, either by Peiser in person, or in orders, and always in the name of A. Levy. The Minden house was always a customer of defendant, and ordered goods, and paid for them, sometimes in money, sometimes in drafts. Defendant paid plaintiffs for one bill only purchased for the Minden house, and that was the first; and Peiser says the Minden house furnished the money.

It seems that some one at Shreveport told Focke that defendant was sending goods from his Shreveport store to the store at Minden; and that a wagon-load of goods had left defendant's store, marked with the name of A. Levy. Somebody else had told him that the stock at Minden was much larger than that of defendant at Shreveport; and defendant told him that the Minden store did not belong to him. The truth seems to have been that the wagon-load of goods in question had been ordered by the Minden house; that they had but recently arrived at Shreveport by rail; and that they were taken by the wagon from the depot. The returns of the sheriffs of Caddo and Webster parishes, respectively, on the writs of attachment, show that the stock seized at Shreveport was appraised at nearly three times as much as that seized at Minden.

It would be difficult to connect the establishment of the store at Minden, in October, 1877, under the original agreement, or the retirement of defendant in January, and the corresponding changes then made, with any fraudulent intent by which defendant may be supposed to have been actuated at the time this suit was brought in October, 1878.

The relations between plaintiffs and defendant had been very friendly. Defendant had dealt with them for six years. The account sued on shows that on the 5th April, 1878, there was a balance against defendant of $800. From that date to the 20th August, inclusive, the debits, including two items of cash, one of $400, on the 13th April, the other of $575, on the 25th April, had increased to $3159 95; and the credits, up to same date, including two items of cash, one of $575 on the

·22d April, the other of $500, on the 3d June, amounted to $1078, or :$103 more than the two items of cash to the debit. It seems, therefore, that defendant had done nothing to impair his credit with plaintiffs, nothwithstanding his losses by the failure of Tomkies' Bank, and the ·disastrous fire of 10th February.

In a letter of 26th April, 1878, defendant wrote to plaintiffs : " I ·wanted to send you funds from my Minden store ; but business is very ·dull there, and I have to rely on my own resources." On the 29th July the Minden house remitted $100 to plaintiffs, on account, and wrote : ·"·Would have remitted sooner, but was under the impression that L. A. Levy had done so. Would ask of you for the balance due until 1st of ·September, and will assure you that, in the future, will be more prompt. :Hoping to hear from you soon, I remain

" A. LEVY, per PEISER."

If the letter of 26th April would have created the impression, with. ;a stranger, that defendant owned the Minden store, it could not have had that effect with plaintiffs, because they had a running account with that store, in the name of A. Levy ; and Peiser had told them, in February, when purchasing goods for that store, that he was a partner of A. Levy. This letter could have had no effect in enlarging defendant's credit, because it plainly informed plaintiffs that the Minden store was not one of his own resources for the payment of his debts ; and of the ·-entire amount to his debit on the 20th August, $3159 95, only $489 30 ·were for goods sold after the date of that letter.

The letter of 29th July, offered in evidence by plaintiffs, plainly indicated that the Minden store did not belong to defendant ; and it repeated, what plaintiffs knew from their dealing and accounts, that the firm of A. Levy was the ostensible owner, and their ackowledged debtor for the goods sold to that firm. It may be that defendant had expected, before the letter of 26th April was written, to receive money, either on account of goods previously sold to the Minden firm, or for temporary accommodation ; and that the firm of A. Levy, before the letter of 29th ·July was written, had expected a remittance of $100 to be made by defendant to plaintiffs, either on general account or as a temporary ac-·commodation.

But this testimony is of no importance in the solution of the pre-·cise questions at issue. The proof shows that defendant had no prop-·erty except the goods, furniture, and fixtures pertaining to his business ; .and there is no testimony tending to show that he had offered, or at-·tempted, or intended to dispose of any thing that he had for sale other-·wise than in the legitimate course of his regular business, as a perma-·nent merchant and dealer. No doubt he was embarrassed financially ; ·but his credit sufficed to enable him to take a lease for three years of

the store in which he resumed business soon after his losses by the fire were adjusted. He went to New York with only $500, in money ; and he had purchased, on time, a stock of goods which he was selling every day. No one except plaintiffs was pressing him. No one had brought suit against him. He had no domestic creditor whose debt was then due, except the bank ; and the bank, in which his account had been over-drawn for several months, to the extent of $1800, had not thought it necessary to take steps against him. He was, apparently, doing well, with a new stock on hand, and goods en route ; and his cash sales from the 1st to the 21st October, inclusive, amounted to $1978. According to the testimony of business men at Shreveport, the sales in November are usually double those in October, and the December sales are double those of November. There was reason, therefore, for the opinion ex-pressed by one of the witnesses, himself a creditor, that defendant would have paid his debts if he had been let alone. The attachment came most inopportunely for him, just after the raising of the quaran-tine, at the beginning of the most active part of the business year ; and when he had purchased, on credit, a large stock of goods, which he could have paid for only out of the sales.

There are other facts which merit brief notice only because of the importance attached to them in the argument. Besides his store, defend-ant had a candy factory, capable of making 750 pounds a day, from which he derived good profits. He had also an ice-cream saloon, in which there were four mirrors, worth from $20 to $25 each. At the close of the season he had no use for those mirrors ; and two merchants who wanted, each, two mirrors for their stores, offered to buy them. Defendant said they were not for sale, but that he would lend them, on condition that they were to be returned, at the opening of the season, or be paid for if injured. These mirrors were publicly exposed in the two stores ; and they were attached by plaintiffs, and were promptly given up to the sheriff.

There were also some parts of a soda-fount, a box supposed to con-tain silver, it was really plated-ware, worth from $25 to $35, and some marble slabs, tops of tables, used in the ice-cream saloon, which had been removed into the bed-room, over the store, occupied by defendant and his brother, for the reason that the ice-cream saloon was wanted and was used for a warehouse. When the sheriff attached the goods in the store, defendant's brother and a colored servant moved their articles into the adjoining room, occupied by Gilham. Defendant says this was done without his consent. Be this as it may, they were not claimed by Gilham ; and they were subsequently attached under plaintiffs' writ.

It is evident that defendant was not able to pay all his debts imme-diately ; but this involved no moral turpitude. According to his

estimate his losses by the fire largely exceeded the insurance; and he was compelled to submit to considerable reduction on his policies in order to effect a settlement with the underwriters. He resumed business within a very short time after the fire; he took a lease of the new store for three years; and at the beginning of the business season he had an ample stock on hand, and arrangements made for future supplies. The $100 which he paid Focke on account on the 16th October, he had just received from a customer for a bill of goods sold for cash; and on the day the attachment was levied he protected his name in bank by paying a note or bill which matured that day. His entire conduct shows that it was his intention to continue permanently in the same business which he had pursued for six years; and to protect the credit which he enjoyed.

The right to attach depends upon the state of facts existing at the time the writ is issued; and there is no proof of any fact from which it could reasonably be inferred that defendant had disposed of, or that he was about to dispose of any part of his property with intent to place it beyond the reach of his creditors, or to give an unfair preference to some of them, or otherwise to defraud them. The attachment was properly dissolved; and plaintiffs are liable in damages, on the reconventional demand.

The charges on which the attachment was granted in this case are precisely those which would affect most injuriously the character and credit of a merchant. The attachment effectually broke up defendant's business; and it must have destroyed his credit. There are no reliable data upon which the amount of pecuniary loss suffered by defendant can be estimated, otherwise than conjecturally. If he had been permitted to go on in business he might have made large profits, or he might have suffered losses, and have failed. The district judge did not give any opinion in writing; but we infer from the testimony that he fixed the amount awarded as general damage by estimating the profits which defendant might have derived from the sale of the goods attached. This damage was the direct and inevitable consequence of the seizure and detention of the goods; and the amounts allowed for general and special damage seem to us just and reasonable. On a mere question of the quantum of damage we would not be inclined to disturb the verdict of a jury, or the estimate of the judge, who saw and heard the witnesses, except where manifest injustice has been done; and we shall not increase the damages in this case.

The judgment appealed from is, therefore, affirmed with costs.